IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DALE J. GUTIERREZ,

       Plaintiff,

vs.                                                                No.  06cv0428 DJS

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's (Gutierrez') Motion to Reverse and

Remand Administrative Agency Decision **[Doc. No. 7]**, filed October 16, 2006, and fully briefed

on December 29, 2006.  On December 29, 2005, the Commissioner of Social Security issued a

final decision denying Gutierrez' application for disability insurance benefits.  Having considered

the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed,

the Court finds the motion to remand is well taken and will be **GRANTED**.

**I.  Factual and Procedural Background**

Gutierrez, now fifty-one years old (D.O.B. December 12, 1955), filed his application for

disability insurance benefits on April 17, 2003 (Tr. 14), alleging disability since September 20,

1998, due to lower back injury and pain (Tr. 67).  The Commissioner's Administrative Law Judge

---

[1] On February 1, 2007, Michael J. Astrue became the Commissioner of Social Security.  In
accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is substituted
for Jo Anne B. Barnhart as the defendant in this action.

(ALJ) found Gutierrez was insured through December 31, 2003.  Tr. 14.  Therefore, Gutierrez

had to establish disability on or before that date in order to be entitled to a period of disability and

disability insurance benefits.  *See Henrie v. United States Dep't of Health & Human* Servs., 13

F.3d 359, 360 (10th Cir. 1993)("Because Ms. Henrie's insured status expired on December 31,

1987, she must prove she was totally disabled prior to that date.").  Gutierrez has a high school

education and past relevant work as a service technician, service advisor, and a fleet manager.  Tr.

18.

On December 29, 2005, the ALJ denied benefits, finding Gutierrez was not disabled within

the meaning of the Social Security Act because, based on the testimony of a vocational expert

(VE), Gutierrez was "capable of making a successful adjustment to other work that exists in

significant numbers in the national economy."  Tr. 19.  As to his credibility, the ALJ found

Gutierrez' "statements concerning the intensity, duration and limiting effects of his symptoms

[were] not entirely credible."  Tr. 17.  Gutierrez filed a Request for Review of the decision by the

Appeals Council.  On March 23, 2006, the Appeals Council denied Gutierrez' request for review

of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the

Commissioner for judicial review purposes.  Gutierrez seeks judicial review of the

Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

2

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the

Commissioner finds the claimant is not disabled.  *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is

not engaged in substantial gainful employment, he has an impairment or combination of

impairments severe enough to limit his ability to do basic work activities, and his impairment

meets or equals one of the presumptively disabling impairments listed in the regulations under 20

C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Gutierrez makes the following arguments: (1)  the

ALJ erred in failing to consider the side effects of his medications on his ability to work; (2) the

ALJ erred in failing to fully and fairly develop the medical evidence; and (3) the ALJ failed to

sustain her burden of establishing that there is other work in the national economy he can perform.

## Side Effects of Pain Medication

Gutierrez contends the ALJ mischaracterized the evidence concerning the side effects he

has with the pain medication.  Gutierrez claims the amount and effect of medications he takes

have an impact on his capacity to work and "were additional limitations which should have been

considered impeding [his] ability to perform a full range of work."  Pl.'s Mem. in Support of Mot.

to Reverse and Remand at 13.

At the October 25, 2005, administrative hearing Gutierrez testified as follows:

ALJ:   Oh, Okay.  All right.  After you first injured your back.  It looks like 1998?

A:   Yes.

ALJ:   **How long did you find that you were able to stand for one period of time without having to take a break?**

A:   Half an hour to an hour.

ALJ:   **Okay.  And what about sitting?**

A:   Sitting was the same thing.  Half an hour to an hour.

ALJ:   All right.  And what sorts of things made your pain worse?

A:   Any type of exercise except the movements, you know.

ALJ:   Well, what about now?  Now that you have had your surgery.  How are you doing?

A:   The surgery.  I'm doing better.  I see a difference.  It is a different type of pain that I have.  When I first went to Dr. Giletto, he explained to me that this wasn't a cure for your back.  This was just basically to help you with the pain.

ALJ:   Okay, so what is the difference?  Tell me can you describe between before and now?

A:   I don't feel as much pain down my leg.

ALJ:   Okay.

A:   Now as what I did.  The back pain is still maybe 10 percent better than what it was.

ALJ:   And are you taking medications?

A:   Yes.

ALJ:   Okay.  What do you take?

A:   Oxycodone (narcotic analgesic for moderate/severe pain), Baclofen (muscle relaxant), Celebrex (nonsteroidal anti-inflammatory drug), Lunesta (sleep medication), Trazodone

5

(antidepressant), Gabitril (antiepilepsy drug), <u>Neurontin</u> (used for some types of pain),

Zoloft (antidepressant), and Wellbutrin (antidepressant).  I believe that is all of them.

ALJ:    Now are these medications that you have been taking over the long term?

A:      <u>The how should I put it.  It is not as strong a dose of what I used to get.</u>

ALJ:    Okay.  Of what?

A:      <u>Of the pain medications</u>.

**  **  **  **  **  **

ALJ:    Now if before your surgery somebody had told you that there was a job for you sitting at a

        desk, and not doing any heavy manual labor where you could take a break, you know.  A

        fifteen minute break every two hours, and at least half hour lunch break in the middle of

        the day.  Do you think you would have been able to do that?

A:      To a certain extent.

ALJ:    Okay.  What do you mean by that?

A:      Well, you know, for me to sit still for a period of time is still, you know.  I am constantly

        moving myself or adjusting myself.

ALJ:    Okay.  And why is that?

A:      It gets uncomfortable any way I sit, laying down for certain periods of time, walking for

        certain periods of time because that was one of the things that all my doctors said, you

        know.  You need to get out and walk and, you know, get some exercise basically.

ALJ:    Okay.  And did you do that?

A:      Yes.

ALJ:    Did that seem to help?

A:      I do walk.  Actually I walk quite a bit.  I will walk probably some days maybe a half mile

or something like that.

ALJ:   Okay.

A:      But it is not frequent.  I mean, I try to do it and I do it and the next day I usually hurt

some or the next day, you know.

** ** ** ** ** **

ALJ:   So you are a house husband?

A:      Yes.

ALJ:   Yes.  I have one of those.

A:      I would rather be working then–

ALJ:   Well, yeah.  Working outside the home I know.  So do you end up having to fix meals

and—

A:      Yes.  I do all the cooking, and try to do the cleaning of the house and the laundry.  I try to

do it all, you know.  I mean, I just don't feel I am one of those type of people that, you

know.  I'm not going to sit there and feel sorry for myself, and at the same time I realize

my wife has worked eight hours or 10 hours because she is on flex time.  So there are days

that she works 10 days that she doesn't need to come home and do that.

ALJ:   Okay.  And how are you able to hold up doing those things?

A:      I hurt from it.  I mean, you know, any certain amount of, you know, up and down

movements and that type of thing, you know.  I start hurting exerting myself where I've

got to start taking pain medications again.

ALJ:   **And how about the pain medications?  Do you have any side effects?**

7

A:      None that I've seen other than being tired, and you know, putting me to bed sometimes.

ALJ:    Have you gone to voc rehab?

A:      No.

ALJ:    How come?

A:      They never offered it.

ALJ:    Are you able to do any house maintenance repairs around the house?

A:      I mow the grass but that is with a self-propelled lawn mower, you know.  Sweep around the house.

ALJ:    Okay.

A:      Water the grass and that type of thing.

ALJ:    Do you drive?

A:      Very limited.  It depends on how many drugs I've taken for that day.

ALJ:    **Okay.  So they do have some affect on you**?

A:      Oh, yes.

ALJ:    Okay.  Can you be a little more specific?

A:      Lightheadedness, dizzy, sleepy, tired.

                           **     **   **   **   **   **   **

ALJ:    All right.  I want to ask some, well, okay.  Other than what we have discussed is there anything else?

A:      Well, I mean, you know.  My ability to go back to work.  I mean, with me being on the current drugs that I am taking.  They find out that you have had back surgery and

probably 99 percent of the job force is out there against you.  I man, they drug test you or find out you had a back injury, and they just don't want to hire you.

ALJ:   Okay.  **Have any of your doctors told you the sorts of work you should be looking for, or the limitations that you should keep in mind**?

A:   Yeah.  They've told me light to medium work.  As far as lifting, to keep that to a minimum.  I mean, not to be lifting, of course, extremely heavy objects, you know.  At this time I think I am able to do 20 pounds I think is what he told me.

ALJ:   How often?

A:   He really didn't tell me as far as how often.

ALJ:   We look in terms of these are actually terms of art, occasionally, frequently, constantly, never.  Occasionally is up to one-third of the workday.  Frequently is up to two-thirds of the workday.  Do you think you could lift and carry 20 pounds up to two-thirds of the workday.

A:   No.

ALJ:   Up to one-third of the workday?

A:   No.

ALJ:   Okay.  **What about 10 pounds?  That is a little more than a gallon of milk**?

A:   I probably could do it.

ALJ:   **Two-thirds of the workday**?

A:   Probably.  I mean, I would probably would hurt from it, you know.

**       **       **       **       **       **

Tr. 300-309 (emphasis added).  Thus, Gutierrez' testified that his pain had lessened since his surgery such that he now required a lower dosage of his pain medication.  However, Gutierrez also testified he experienced a feeling of tiredness from the pain medication.  Further on in his testimony, Gutierrez testified that he also experienced lightheadedness, dizziness, and sleepiness.  These are all reported adverse reactions to oxycodone.  *See*

http://www.drugs.com/pro/oxycodone.html.  Somnolence, dizziness, and fatigue are also adverse reactions to Neurontin.  *See* http://www.drugs.com/ppa/gabapentin.hmtl.  The record also indicates that, in the Daily Activities Section, Gutierrez reported he experienced "sleepiness" and took "naps" due to the medication and would "water the grass if meds did not make [him] to sleepy."  Tr. 96.  Moreover, Gutierrez reported he 'need[ed] assistance only at times when on medications."  *Id*.  Significantly, in his Disability Report, under Section 4-Medications, Gutierrez provided the following information:

| | | |
|---|---|---|
| Neurontin | Pain | Tiredness, drowsiness |
| Oxycontin | Pain | Dizziness, drowsiness, headaches |
| Roxicet | Pain | Dizziness, drowsiness, mood changes |
| Trazodone | Sleep | Drowsiness, dizziness |

Tr. 115.  And, under Section 10-Remarks, Gutierrez provided the following information:

| | | |
|---|---|---|
| Zoloft | Depression | **Dizziness**, nausea, sweating |
| Wellbutrin | Antidepressant | Agitation, difficulty sleeping, dry mouth, nausea |
| Ambien | Sleep | Daytime drowsiness, dizziness |
| Celebrex | Anti-inflammatory | Upset stomach, headache |

Nexium          Heartburn                Headache, diarrhea

Tr.  118.  Gutierrez also submitted a statement claiming "the back surgery was affective (sic)

however the surgery was to help with the pain, the discomfort Level is where I will need to still

take various drugs including narcotics for the rest of my life."  Tr. 289.  The medical record also

supports Gutierrez' complaints of pain and his need for narcotic pain medication.  *See* Appendix

A.  In fact, in August 2002, Dr. Burg, a Physical Medicine and Rehabilitation specialist, opined

Gutierrez would require narcotic pain medications "chronically" stating: "I renewed all of his

medications, **which he will probably be on chronically**, including his Percocet #60, OxyContin

10 mg every 6 hours #120, baclofen 10 mg four times a day, Zoloft 50 mg every day and

Wellbutrin 150 mg every day."  *Id.* (emphasis added).  Tr. 242.  The Court also notes that not one

of Gutierrez' physicians noted any symptom magnification.  Moreover, Gutierrez underwent

multiple serious invasive procedures in an attempt to alleviate his pain.

It is settled that the hypothetical question "must include all (and only) those impairments

borne out by the evidentiary record." *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir.1995).

"[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's

impairments cannot constitute substantial evidence to support the [Commissioner's] decision."

*Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir.1991)(quotation omitted).

Although the ALJ included in her hypothetical to the VE that Gutierrez suffered pain but

could understand, remember and carry out simple to moderately complex instructions and tasks,

the ALJ did not mention any of the side effects Gutierrez reported he experienced with pain

medications.  Contrary to Gutierrez' testimony, the ALJ specifically noted in her decision: "He

does not have side effects from his medications."  Tr. 18.  Accordingly, the ALJ's hypothetical question to the VE was flawed.

In this case, the ALJ found Gutierrez retained the RFC to perform less than the full range of sedentary work due to his limitations.  Tr. 18.  Specifically the ALJ found:

> If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by the Medical-Vocational Rule 201.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent to which these limitations erode the unskilled sedentary occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience and residual functional capacity.

Tr. 18-19.

"An RFC for less than a full range of sedentary work reflects very serious limitations resulting from an individual's medical impairment(s) and is expected to be relatively rare."  SSR 96-9p, 1996 WL 374185 at *1.  This is so because "[u]nder the regulations, 'sedentary work' represents a significantly restricted range of work" and "[i]ndividuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations."  *Id*. at *2.  Accordingly, "[a]n accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it is necessary to make use of a vocational resource."  *Id*. at *5.  Because the ALJ failed to consider the side effects Gutierrez' experiences with his narcotic pain medication, the Court will remand this case to allow the ALJ to redetermine the extent to which <u>all</u> of Gutierrez' limitations, including his side effects to narcotic pain medication, erode the unskilled sedentary occupational base.

A judgment in accordance with this Memorandum Opinion and Order will be entered.


**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**

# APPENDIX A

**Medical Records**

On **August 10, 1999**, Robin Hermes, M.D., performed right L3-4, L4-5, L4-5, intraarticular facet injections under fluoroscopic guidance.  Tr. 166-168.  Dr. Hermes noted Gutierrez was sleeping better with Nortriptyline but had not yet seen a physical therapist.  Tr. 167.  The physical examination showed Gutierrez had "discrete tender[ness] to palpation over the mid lumbar paraspinous muscles," greater on the left side.  *Id.*  Gutierrez could perform flexion maneuvers without much difficulty but extension maneuvers exacerbated and reproduced his pain.  Gutierrez had normal motor strength and sensation throughout his lower extremities and a positive Patrick's maneuver on the right side (pain elicited with abduction and external rotation of the hip).

On **November 17, 1999**, Dr. Hermes performed a left-sided lumbar medial branch block at L4, L5, sacral ala[2], S1.  Tr. 163.  Dr. Hermes noted: "[Gutierrez] has undergone interarticular facet injections to which he has responded but not for a prolonged period of time.  During his last visit we decided to proceed to a trial of medial branch block and if that is successful perform radiofrequency lesioning which should prolong that effect."  Tr. 164.

Dr. Hermes' examination showed Gutierrez had "discrete tenderness over the lower lumbar paraspinous muscles particularly on the left side" which was exacerbated by extension

---

[2] The bone of the sacral base continue on either side of the vertebral body as a large triangular surface called the ala or wing.  The sacral ala attaches to the psos major and supports the lumbosacral trunk and is formed from the transverse costal processes of the first sacral segment.  *See*  http://cmpd.umd.edu/chordoma/anatomy.pdf

maneuvers.  *Id.*  However, his strength and sensation were normal throughout the lower extremities.

On **December 27, 1999**, Dr. Hermes performed a radiofrequency lesioning of the medial branches at the left, L4, L5, sacral ala, S1.[3]    Tr. 160.  Although Gutierrez reported he responded well to the medial branch trial, he was having worsening pain on the right side.  Dr. Hermes hoped that the radiofrequency lesioning of the medial branches would offer Gutierrez more prolonged benefit than intraarticular facet injections which Gutierrez had received in the past.  At that time, Gutierrez reported he was taking Nortriptyline and Ibuprofen.  Tr.  161.  Although Gutierrez was taking Ultram he complained that it did not help him.  Dr. Hermes also noted that Gutierrez had responded well to intraarticular facet injections but not for a prolonged period of time.  *Id.*

On **January 17, 2000**, Dr. Hermes performed a medial branch blocks of right L4, L5, sacral ala and S1.  Tr. 158-159.  Dr. Hermes noted Gutierrez had previously had a medial branch block trial as well as radiofrequency lesioning on the left side which he felt were helpful.  Tr. 158.

On **February 7, 2000**, Dr. Hermes performed a radiofrequency lesioning of the medical branches at right L-4, L-5, sacral ala and S-1.  Tr.155-157.  Dr. Hermes noted that Gutierrez had previously had a radiofrequency lesioning on the left side and found it beneficial.  Gutierrez reported having "a positive response to the medial branch block trial."  Tr. 155.  On that day, Gutierrez reported he was taking Nortriptyline, Ibuprofen, and Ultram.  Tr. 156.  Dr. Hermes

---

[3] Radiofrequency lesioning is a procedure using a specialized machine to interrupt nerve conduction on a semi-permanent basis.  The goal is to interrupt the pain signals to the brain thus eliminating the pain.  *See*  http://reddinganesthesia.com/radio_frequency_lesioning_faq.htm.

noted Gutierrez walked with a normal gait, had discrete tenderness over the lower lumbar paraspinous muscles on the right side, which was exacerbated by extension maneuvers, but not flexion maneuvers, and had mild tenderness on the left side.  However, Gutierrez' strength and sensation were normal.

On **February 15, 2000**, Gutierrez returned for a follow up visit with Dr. Hermes.  Tr. 184.  Gutierrez reported he was becoming depressed over the chronicity of his pain.  Dr. Hermes diagnosed Gutierrez with lumbar facet syndrome, status post radiofrequency lesioning of medial branches bilaterally, continued chronic low back pain, and spondylolisthesis.  Dr. Hermes referred Gutierrez to a behavioral psychologist.

On **March 16, 2000**, Dr. Hermes performed a lumbar epidural steroid injection on Gutierrez.  Tr. 153-154.  Gutierrez' chief complaint was "low back pain."  Gutierrez reported he had partial alleviation of his pain following the radiofrequency lesioning of medial branches.  On that day, Gutierrez reported he was taking nortriptyline and ibuprofen.  Dr. Hermes noted:

> Mr. Gutierrez is a 43 year-old gentleman with a history of low back pain dating back to September of 1998.  As mentioned, he has responded to radiofrequency lesioning of the medial branches in the past, but there was one area that did not seem to be improved.  During his last visit, it was suggested that perhaps an epidural may be of benefit.  He does have evidence on Magnetic Resonance Imaging of mild spondylolisthesis.[4]  We are going to try an epidural.  <u>As mentioned, if that is not helpful, I do not think that further invasive intervention is indicated</u>.
>
>                         \*\* \*\* \*\* \*\* \*\* \*\*
>
> He is a well-nourished, well-developed gentleman.  He walks unassisted with a normal gait.  There is a mild tenderness over the lower lumbar paraspinous muscles, bilaterally.  This is exacerbated by extension maneuvers, more so than flexion maneuvers.  His strength and sensation are normal throughout his lower extremities.

153-154 (emphasis added).

---

[4] Spondylolisthesis occurs when one vertebra slips forward on the adjacent vertebrae. *Stedman's Medical Dictionary* at 1656 (26th ed.1995).

On **April 3, 2000**, Jonathan Burg, a Physical Medicine and Rehabilitation specialist, evaluated Gutierrez.  Tr. 281-283.  Dr. Burg noted:

> For his back he was referred by Dr. Vitec to Dr. Wellborn who then referred him to Dr. Castillo who said he only had "mechanical back pain."  He had a short course of physical therapy and the was placed at MMI and given a 0% impairment rating by Dr. Wellborn.  He did have some facet injections and even a facet denervation with radio waves by Dr. Hermes  He states that he really didn't get any relief of pain from these procedures.  He was found on MRI to have a Grade I spondylolisthesis at L5-S1 with a pars defect but no significant disk pathology in terms of herniations.
>
> **The patient continues to experience significant low back pain, which is constant, worse with motion, worsening throughout the day over time**.
>
> Medications:  ibuprofen, hydrocodone, Nortrptyline, Celexa, Lodine.
>
> ** ** ** ** ** **
>
> Physical Examination:
> Examination reveals a pleasant, cooperative gentleman in no acute distress.  He's a bit deconditioned appearing.
>
> Examination of the shoulder revealed well-healed arthroscopy port.  ROM is somewhat limited in internal rotation and abduction but certainly functional.
>
> Examination of the back reveals decreased ROM with a ratcheting motion with forward flexion and extension.  In order for him to bend forward, he has to basically support himself on his knees and he has difficulty getting out of the chair without using his arms and pushing off the armrests.  He's tender over the L5-S1 facet joints.  Straight leg raising is negative.  Reflexes are equal and symmetric at the knees and ankles.  Sensation is intact throughout all dermatomes.  Strength is 5 out of 5 in all major muscle groups.
>
> ** ** ** ** ** **
>
> **Procedure**
> With the likely diagnosis of facet-mediated pain as the cause of his continued discomfort due to his spondylolisthesis, after careful cleaning with alcohol and Betadine I undertook facet region injections with Kenalog and procaine.  He noted rather impressive relief of pain following the injections, which, of course, were performed without fluoroscopy.  He was able to bend over to within 8 inches of the ground without any ratcheting.
>
> ** ** ** ** ** **
>
> Given the amount of guarding and muscle spasm that I saw today on examination he would qualify for a 5% impairment rating and I'm frankly somewhat surprised that he was not given 5% for DRE Category II lumbosacral.

4

Tr. 282-283.  Dr. Burg ordered "bending films" of the lumbar spine.  The x-rays indicted

Gutierrez had "Grade I spondylolisthesis of L5 and S1 with no evidence of significant change

identified on flexion-extension views."  Tr. 280.

On **April 13, 2000**, Gutierrez returned to see Dr. Burg.  Tr. 277-278.  Gutierrez reported

marked relief following the facet region injections.  Tr. 277.  Dr. Burg referred Gutierrez to

physical therapy.

On **May 15, 2000**, Gutierrez returned for a follow-up with Dr. Burg.  Tr. 276.  Gutierrez

requested another facet injection.  Dr. Burg administered a facet injection of Kenalog and

procaine into the right sacroiliac joint with excellent relief.

On **June 15, 2000**, Gutierrez returned for a follow-up with Dr. Burg.  Tr. 275.  Gutierrez

reported that he had not had as much relief from the May 15th injection but wanted to try again.

Dr. Burg opined that Gutierrez would require a diskogram in order to determine if the pain was

disk pain.  However, Dr. Burg also noted Gutierrez was not responding to physical therapy as he

had expected.  Dr. Burg administered a facet injection with Kenalog and procaine into L5-S1.

On **June 29, 2000**, Gutierrez returned for a follow up with Dr. Burg.  Tr. 274.  Gutierrez

reported relief with the last injection.  Dr. Burg referred Gutierrez to Dr. Hermes for facet

denervation and prescribed Percocet one tablet twice a day as needed.

On **July 20, 2000**, Gutierrez returned for a follow up with Dr. Burg.  Tr. 273.  Gutierrez

reported the effect of the last injection had worn off.  On examination, Gutierrez continued to

show marked tenderness over the lumbosacral facet joints.  Dr. Burg renewed Gutierrez'

prescriptions for Wellbutrin (increased to 300 mg every day) and Percocet.

On **July 24, 2000**, Gutierrez returned for a follow up with Dr. Hermes.  Tr. 183.

Gutierrez informed Dr. Hermes that Dr. Burg had recommended an SI injection.  Dr. Hermes'

examination revealed an antalgic gait, slightly decreased range of motion of the right hip, and pain

with Patrick's maneuver on the right side.

On **July 26, 2000**, Gutierrez returned to see Dr. Hermes.  150-151.  Dr. Hermes

performed a right sacroiliac injection. On that day, Gutierrez reported he was taking Nortriptyline

(antidepressant) and Ibuprofen.  Tr. 151.

On **August 10, 2000**, Gutierrez returned for a follow up with Dr. Burg.  Tr. 272.

Gutierrez stated the SI joint injections helped a little but lasted only a week and complained that

the pain had returned.  Dr. Burg consulted with Dr. Hermes and opined that "there really [was]

not a whole lot else to do."  *Id.*  Dr. Burg opined Gutierrez had reached MMI.  Dr. Burg

prescribed Percocet and Vioxx 25 mg every day and directed Gutierrez to return on an "as needed

basis."

On **September 7, 2000**, Gutierrez returned to see Dr. Burg.  Tr. 271.  Gutierrez

complained of significant pain.  Gutierrez also reported the Wellbutrin was no longer controlling

his anger and irritability.  Dr. Burg did not agree with Dr. Crawford regarding Gutierrez getting a

diskogram because Dr. Burg felt surgery would not make a difference since Gutierrez had already

had facet rhizotomy and "quite a bit of aggressive management of this problem."  *Id.*

On **October 19, 2000**, at Gutierrez' counsel's request, Mark K. Crawford, M.D.,

performed an independent medical examination.  Dr. Crawford completed a physical examination

noting:

> On physical exam Mr. Gutierrez is a well-developed, well-nourished male who presents in no acute distress.  He is pleasant and cooperative throughout the entire examination.  His gait is normal.  He can toe walk and heel walk without difficulties.  He is tender to palpation superficially throughout the lower lumbar spine.  He is most sensitive to pain over the right sacroiliac area.  He has full range of motion of the lumbar spine, including flexion, extension and lateral bending.  His motor strength is 5/5 in all major muscle groups in the lower extremities, his reflexes were 2+ at the knees and 2+ at the ankles and symmetric throughout.  He had a negative straight leg raising in both the supine and sitting positions.  His sensation was intact to both light touch and pin prick.  He did not demonstrate any Waddell's signs.

Tr. 131.  Dr. Crawford opined that Gutierrez had not achieved maximum medical improvement in regards to his right shoulder or his low back.  *Id.*  Dr. Crawford found that Gutierrez had benefitted from his continued pain management "over the past year, but ha[d] not encountered sustained relief."  *Id.*  Significantly, Dr. Crawford noted Gutierrez had had a functional capacity evaluation performed by Langford Physical Therapy which he "would have no reason to doubt its validity."  Tr. 132.  Dr. Crawford agreed with the functional capacity evaluation that Gutierrez was capable of doing medium level work.  However, Dr. Crawford felt Gutierrez' "**continued pain would make him unsafe in a manual labor market**."  *Id.*  Finally, Dr. Crawford agreed with Dr. Burg that a discogram would be in order to determine if any of Gutierrez' pain was the result of discogenic pain.  *Id.*

On **November 6, 2000**, Gutierrez returned to see Dr. Burg.  Tr. 276.  Dr. Burg noted:

> Dale is seen today with multiple questions about his evaluation by Dr. Crawford.  Apparently, Dr. Crawford thought he might benefit from a diskogram.  I explained to Dale that people don't generally benefit from diskograms, as they are not a therapeutic injection, they are a diagnostic injection only, and a painful one at that.  **However, he does feel that he cannot continue with the degree of pain that he is experiencing in his back**.  The only purpose of doing a diskogram would be to consider fusion for his spondylolisthesis grade 1, which is at L5-S1.  That may very well be the cause of his back pain and if the diskogram is positive, the I guess one could consider fusion at that level.  Frankly, I would not be too excited about pursuing that.  However, if Dr. Crawford would be willing to go

> ahead and do that for this man, if the diskogram is positive, then maybe it would help,
> particularly given the fact that he has known spondylolisthesis and he did benefit from
> facet blocks, albeit temporarily, which is the usual response.

*Id.* (emphasis added).   The physical examination showed tenderness at L5-S1.   Dr. Burg

prescribed Percocet and referred Gutierrez to Dr. Keith Winterkorn for a diskogram.

On **November 27, 2000**, Dr. Winterkorn performed a discogram and CT lumbar spine

post discogram.   Tr. 269.   Dr. Winterkorn concluded as follows:  "The patient's discs at L4-5 and

L5-S1 appear normal fluoroscopically and on CT following injection.   The patient did claim pain

on injection at L5-S1 despite its normal appearance."   *Id.*

On **December 1, 2000**, Gutierrez returned for a follow up with Dr. Burg.   Tr. 268.

Gutierrez reported he continued to require Percocet for his pain.   Dr. Burg had not received Dr.

Winterkorn's results.   Dr. Burg renewed Gutierrez' Percocet prescription.

On **February 15, 2001**, Dr. Rabinowitz evaluated Gutierrez for back pain.   Tr. 136-138.

Gutierrez complained of weakness, right greater than the left, sciatica pain right lower extremity,

and occasional foot tingling.   Gutierrez denied bowel or bladder incontinence.   Dr. Rabinowitz

performed a physical examination.   Dr. Rabinowitz noted:

> PHYSICAL EXAM:   Positive lumbar right paraspinal tenderness with palpation.   No
> sacroiliac tenderness.   The patient is able to flex to approximately 80 degrees, limited by pain.
> Extension and lateral range of motion is intact.   Positive straight leg raise at 90 degrees while
> sitting.   Bilateral lower extremity strength -/5.   Sensation to light is intact.   Lower extremity
> reflexes; left patellar and ankle 2/5, right patella and ankle 2+/5.   Ambulation is non-antalgic.
> Rectal; normal tone.

Tr. 137.   Dr. Rabinowitz noted Gutierrez' x-rays of the lumbar spine were negative for fractures,

spondylolisthesis, or osteoarthritis.   Dr. Rabinowitz assessed Gutierrez with chronic low back

pain with radicular symptoms, and new saddle anesthesia.  *Id.*  Dr. Rabinowitz ordered an MRI to check for stenosis.

On **March 17, 2001**, Gutierrez returned to see Dr. Burg.  Tr. 264.  Gutierrez complained of back pain and a sensation of burning of his feet.  Dr. Burg noted tenderness over the length of the right SI joint and over the spinous processes of L4 and L5.  Dr. Burg assessed Gutierrez with "continued low back pain with SI joint arthropathy."  Dr. Burg prescribed Neurontin 100 mg three times a day for seven days, then increase to 300 mg three times a day, for the burning pain.

On **March 22, 2001**, Gutierrez returned to see Dr. Burg.  Tr. 266-267.  Gutierrez reported being in a motor vehicle accident on February 7, 2001.  Tr. 266.  Gutierrez reported developing severe lower back pain that radiated into both his legs.  Dr. Burg assessed Gutierrez with "bilateral sacroiliac stress/strain and two areas of myofascial pain."  *Id.*  Dr. Burg administered injections of Marcain, procaine, and Kenalog into four areas.  Dr. Burg also prescribed Percocet.

On **April 5, 2001**, Joel W. Lubin, M.D., evaluated Gutierrez.  Tr. 134-135.  Dr. Lubin discussed his evaluation with Dr. Crawford.  Dr. Lubin noted Gutierrez had a discogram in the past, which was negative.  Tr. 134.  Gutierrez was there to obtain the results of his MRI.  Dr. Lubin performed a physical examination.  Dr. Lubin noted Gutierrez had 5/5 strength throughout his lower extremities, with dorsiflexion, plantar flexion, extensor hallucis longus, quadriceps, hamstring, and iliopsoas strength and no light touch sensory deficits.  *Id.*  Gutierrez also had a negative straight leg raise bilaterally.  Gutierrez experienced "some increasing back pain with lumbar hyperextension."  *Id.*

The MRI report was consistent with bilateral pars defect at the L5-S1 level, without significant compression of neuro elements. Tr. 134. Dr. Lubin assessed Gutierrez with "persistent low back pain, with grade I spondylolisthesis." Dr. Lubin recommended that Gutierrez continue non-operative management, "given that there is not marked compression of neuro elements, and that he does have a low grade spondylolisthesis." Dr. Lubin prescribed a lumbosacral orthosis (corset), physical therapy, referred Gutierrez to the Pain Clinic, and directed him to return in six months.

On **May 9, 2001**, Dr. Hermes performed a right sacroiliac injection on Gutierrez. Tr. 148-149. On that day, Gutierrez reported he was taking OxyContin and Zanaflex (muscle relaxant). Tr. 149. Dr. Hermes noted:

> Dale Gutierrez is a 45-year-old gentleman with a history of primarily right-sided low back pain, dating back to September 1998. He has had a number of interventions in our clinic, including sacroiliac injections, as well as radiofrequency lesioning. We last saw him in July of 2000. He has a sacroiliac injection that he did feel was helpful, but it did not provide him with sustained benefit. He has been evaluated by a surgeon at University of New Mexico Hospital, who does not recommend surgical intervention. He was also seen at the Pain Clinic at University of New Mexico Hospital, where a repeat magnetic resonance imaging was obtained; however, we do not have the results of this. According to Mr. Gutierrez, there were no significant changes from his previous study. He was most recently seen by Dr. Whalen who refers him today for a repeat sacroiliac injection. We will perform this procedure for diagnostic as well as therapeutic purposes. We will use a small amount of local anesthetic and have his auto-pain-diary to help specifically determine what component his pain is related to this joint.

Tr. 148.

On **June 8, 2001**, Gutierrez returned to see Dr. Burg. Tr. 263. Gutierrez reported having less burning sensation in his feet. The physical examination revealed "tenderness over the superior 1/3 of the SI joint bilaterally, the right sacral aspect of the sacrotuberous ligament, and

over the SI spinous process." *Id.* Dr. Burg assessed Gutierrez with "bilateral SI joint arthropathy with intraspinous ligament tenderness and right sacrotuberous ligament tenderness. Dr. Burg administered injections of Xylocaine to the affected areas, prescribed Neurontin 600 mg twice a day, and Percocet 5 mg every 8 hours as needed for breakthrough pain.

On **July 13, 2001**, Gutierrez returned to see Dr. Burg. Tr. 261-262. **Gutierrez complained that his back pain had increased about 40% greater than prior to the June 8, 2001 injections**. Gutierrez also reported having his legs give out on him a couple of times since the last injections. Gutierrez complained that the injections given by Dr. Hermes only helped him for about two weeks. Dr. Burg noted:

> **Physical Examination**
> Examination of the LS spine reveals flexion beyond 15 degrees causing pain and any extension causes an increase in his pain. He is tender to palpation over the spinous processes of L2, L3, L4, and L5 with the greatest pain at L2 and L5. He is also tender over the PSIS bilaterally, although much greater on the right than the left. Strength is 5/5 and deep tendon reflexes are 2+ and symmetrical.
> **Impression and Plan**
> I believe that Mr. Gutierrez has significant lumbar facet arthropathy. I think he should be referred back to New Mexico Pain and Wellness for possible further lumbar facet injections or perhaps medial branch blocks. In the meantime, I am going to increase his OxyContin to 10 mg every six hours and continue his other medications without change.

*Id.* (emphasis added).

On **August 7, 2001**, Gutierrez returned for a follow up with Dr. Hermes. Tr. 181-182. The physical examination revealed slow ambulation in a slightly stooped position, tenderness over the lower lumbar paraspinous muscles, and pain with deflection and extension. Dr. Hermes recommended further radiofrequency lesioning with concentration on the right side.

On **August 16, 2001**, Gutierrez returned for a follow up with Dr. Burg. Tr. 260. Dr. Burg noted Gutierrez was "basically unchanged." *Id.* Dr. Burg renewed Gutierrez' medications,

including Zoloft 100 mg every day, OxyContin 10 mg every 6 hours, Zanaflez 4 mg three times a dy, Celebrex 200 mg twice a day, and Neurontin twice a day.

On **August 29, 2001**, Gutierrez went to Dr. Hermes for a radiofrequency lesioning of medical branches, right L3, L4, dorsal ramus L5, medial branch.  Tr. 146-147.  Jonathan Burg, M.D., referred Gutierrez for the procedure.  Dr. Hermes, performed the procedure and noted Gutierrez had the procedure in the past which he found helpful.  Dr. Hermes noted Gutierrez **displayed no pain behavior**, ambulated normally, had tenderness over the right lower lumbar paraspinous muscle that was exacerbated by flexion at 60 degrees as well as extension, and his strength and sensation were grossly normal.

On **September 21, 2001**, Gutierrez returned to see Dr. Hermes.  Tr. 143-145.  Dr. Hermes performed a radiofrequency lesioning of medial branches, left L3, L4, S1, dorsal ramus of L5.  Tr. 143-145.  Dr. Hermes noted Gutierrez "had a very good response from radiofrequency lesioning performed on the right side."  Tr. 143.  Gutierrez estimated a 60% improvement.  Dr. Hermes repeated the procedure on the left side to "down regulate his pain even further."  *Id.*  On that day, Gutierrez reported he was taking Zoloft, OxyContin, Celebrex, Neurontin, and Zanaflex (muscle relaxant).  Tr. 144.  Dr. Hermes noted "**no pain behavior**" and "tenderness over the lower lumbar paraspinous muscles.  *Id.*

On **September 24, 2001**, Gutierrez returned for a follow up with Dr. Burg.  Tr. 259.  Gutierrez reported that the procedure performed by Dr. Hermes improved his pain.  Dr. Burg noted that Dr. Hermes had prescribed baclofen.  Dr. Burg increased the Neurontin to 600 mg three times a day and decreased the Zoloft to 50 mg every day.

On **October 24, 2001**, Gutierrez returned for a follow up with Dr. Burg.  Tr. 258.

Gutierrez complained of  "quite a bit of pain" in his sacroiliac joints.  Dr. Burg recommended

steroid injections into the SI joins to get him some immediate relief.  **The physical examination**

**revealed acute tenderness over the SI joints with difficulty getting up and down out of a**

**chair**.  Dr. Burg administered an injection of Kenalog and procaine into the SI joints bilaterally

with good relief.

On **November 14, 2001**, Gutierrez returned for a follow up with Dr. Burg.  Tr. 257.  Dr.

Burg recommended prolotherapy.[5]  Dr. Burg "undertook prolotherapy treatment using a solution

of 15% dextrose, sodium morrhuate, lidocaine and bicarbonate." *Id*.  Dr. Burg injected the facet

regions bilaterally at L4-5, the supraspinous ligament attachments into the vertebrae and the

iliolumbar ligament attachments.  Dr. Burg directed Gutierrez to return in two weeks to repeat the

procedure.

On **November 28, 2001**, Gutierrez returned for a follow up with Dr. Burg.  Tr. 256.

Gutierrez reported the prolotherapy was "quite helpful." *Id*.  **The examination revealed**

**marked tenderness at L4-5 with an abnormal degree of spring**.  Dr. Burg administered a

second injection.

On **December 13, 2001**, Gutierrez returned to see Dr. Burg.  Tr. 255.  Gutierrez

requested further prolotherapy.  The examination revealed tenderness at L4-5 bilaterally.  Dr.

---

[5] Prolotherapy uses a dextrose (sugar water) solution, which is injected into the ligament
or tendon where it attaches to the bone. This causes a localized inflammation in these weak areas
which then increases the blood supply and flow of nutrients and stimulates the tissue to repair
itself. *See* http://prolotherapy.com/prolodefine.htm

Burg administered the prolotherapy injection and directed Gutierrez to hold off for about four weeks to see how he did without the prolotherapy.

On **January 18, 2002**, Gutierrez returned for more prolotherapy.  Tr. 254.  The examination revealed that Gutierrez was still tender over L4-5 and L5-S1.  Dr. Burg administered the prolotherapy injection and directed him to return in two weeks.

On **January 31, 2002**, Gutierrez returned to see Dr. Burg for further prolotherapy injections.  Tr. 253.  The physical examination continued to show tenderness in the L4-4 and L5-S1 region.  Dr. Burg administered the prolotherapy injection and directed Gutierrez to return in two weeks.

On **February 14, 2002**, Gutierrez returned to see Dr. Burg for further prolotherapy.  Tr. 252.  Dr. Burg noted "continued tenderness at L4-5 and L5-S1 over the facet regions bilaterally. Dr. Burg administered a prolotherapy injection and directed him to return in two weeks.

On **February 28, 2002**, Gutierrez returned to Dr. Burg for further prolotherapy.  Tr. 251. Dr. Burg administered a prolotherapy injection and directed him to return in two weeks.

On **March 14, 2002**, Gutierrez returned to Dr. Burg for further prolotherapy.  Tr. 250. Dr. Burg administered a prolotherapy injection and directed him to return in 2 ½ weeks.

On **April 1, 2002**, Gutierrez returned to Dr. Burg for further prolotherapy.  Tr. 251.  Dr. Burg administered a prolotherapy injection and directed him to return in two weeks.

On **April 15, 2002**, Gutierrez returned to Dr. Burg for further prolotherapy.  Tr. 248.  Dr. Burg noted:

> Dale is seen today in follow up.  He wants further prolotherapy since he has started to see a really significant difference in this pain level.  He states that the numbness and tingling is decreasing markedly in his legs and he is able to sleep through the night without much pain.

14

He is also taking less Percocet and OxyContin.  He definitely is getting good results from the current treatment.

*Id*.  Dr. Burg's examination revealed tenderness from L4 down to the sacrum.  Dr. Burg directed Gutierrez to return in two weeks.

On **April 29, May 13, May 28, and June 13, 2002,** Gutierrez returned to Dr. Burg for prolotherapy.  Tr. 247-244.  On **June 13, 2002**, **Dr. Burg determined that he could no longer administer prolotherapy because the back had tightened up so much that Gutierrez was starting to feel pain in his neck.  Dr. Burg decided to use medication management instead**.  Dr. Burg administered the last prolotherapy injection.

On **July 3, 2002**, Gutierrez returned to see Dr. Burg.  Tr. 243.  Dr. Burg renewed all Gutierrez' medications and directed him to return as needed.

On **August 21, 2002**, Gutierrez returned to see Dr. Burg.  Tr. 242.  Gutierrez reported he had returned to working a couple of days helping his brother even though his back continued to bother him.  However, Gutierrez reported his back was better since undergoing the prolotherapy.  The examination revealed that he was still "diffusely tender with lumbar flexion and extension deficits."  *Id.*  Significantly, Dr. Burg noted: "I renewed all of his medications, **which he will probably be on chronically**, including his Percocet #60, OxyContin 10 mg every 6 hours #120, baclofen 10 mg four times a day, Zoloft 50 mg every day and Wellbutrin 150 mg every day."  *Id.*  (emphasis added).

On **September 19, 2002**, Gutierrez returned to see Dr. Burg.  Tr. 241.  **Gutierrez asked that Dr. Burg increase his Percocet to three times a day since "some of the numbness [was]**

**wearing off from his facet rhizotomy**." *Id.* Dr. Burg noted the physical examination was unchanged and increased the Percocet to three times a day.

On **October 17, 2002**, Gutierrez returned to see Dr. Burg. Tr. 240. Dr. Burg noted that nothing had changed. Gutierrez continued on the multiple pain medications, antidepressants, and antispasmodics for his low back pain. Gutierrez was considering returning to Dr. Hermes for repeat rhizotomies (surgical severance of spinal nerve roots for the relief of pain).

On **November 15, 2002**, Gutierrez returned to see Dr. Burg and requested he be sent back to Dr. Hermes for facet rhizotomies in the lumbar spine. Tr. 239. Dr. Burg noted "continued tenderness in the lumbar spine and sacroiliac joints." *Id.* Dr. Burg referred Gutierrez to Dr. Hermes for repeat facet rhizotomies and renewed his prescriptions.

On **December 9, 2002**, Gutierrez went to Dr. Hermes who performed a radiofrequency neurotomy medial branches at right L3, L4 and dorsal ramus of L5 under fluoroscopic guidance. Tr. 140-142. Gutierrez reported that "previous radiofrequency neurotomy was beneficial." *Id.* On that day, Gutierrez reported he was taking Zoloft, OxyContin, Celebrex, and Neurontin. Dr. Hermes, noted she had seen Gutierrez in August and September 2001 when he underwent radiofrequency neurotomy "which did significantly down regulate his low back pain." Tr. 141. **Gutierrez complained that his pain had returned "similar to what he has experienced in the past**." *Id.* Dr. Hermes reported "**no pain behavior**." *Id.*

On **December 13, 2002**, Gutierrez returned to see Dr. Burg. Tr. 238. Gutierrez reported Dr. Hermes had performed rhizotomies in the cervical spine. Dr. Burg renewed Gutierrez' medications, noting Gutierrez had been on these for two years.

16

On **January 13, 2003**, Gutierrez returned to see Dr. Burg.  Tr. 237. Gutierrez'
examination revealed "diffuse tenderness in the lumbar spine."  *Id.*  Dr. Burg renewed all his
medications.

On **February 12, 2003**, Gutierrez returned to see Dr. Burg.  Tr. 236.  Gutierrez reported
Dr. Hermes had performed his rhizotomy which was quite painful and requested an injection.  Dr.
Burg injected the L4-5 paravertebral region with significant relief.  Dr. Burg renewed all his
medications and directed him to return in one month.

On **March 13, 2003**, Gutierrez returned to see Dr. Burg.  Tr. 235.  Dr. Burg noted: "**He
is having increasing back pain despite all the procedures we have done on him**."  *Id.*  **The
examination was unchanged with diffuse tenderness in the lumbar musculature and over
the facet regions**.  Dr. Burg prescribed an RS-41 muscle stimulation/interferential current
stimulator.

On **April 10, 2003**, Gutierrez returned to see Dr. Burg.  Tr. 234.  Dr. Burg noted
"nothing has changed."  *Id.*  Gutierrez reported he preferred the interferential current because the
muscle simulation current was simply too uncomfortable for him.  The examination was
unchanged.

On **April 14, 2003**, Gutierrez returned to see Dr. Hermes.  Tr. 179-180.  Dr. Hermes
noted that the pain Gutierrez was experiencing was **right-sided radicular pain**.  **His level of
pain on that day was 8/10**.  Dr. Hermes recommended a transforaminal epidural steroid injection
on the right side at the level of L5-S1.

On **May 8, 2003,** Gutierrez returned to see Dr. Burg.  Tr. 233.  Gutierrez requested he
see another surgeon since Dr. Crawford had moved out of state.  Dr. Burg referred him to Dr.

17

Gelinas.  Dr. Burg noted Gutierrez "**continues with low back pain and radiating buttock and leg pain consistent with radiculopathy due to the disk pathology and spondylolisthesis**."  *Id.*

On **May 16, 2003**, Dr. Hermes performed a right L5-S1 transforaminal epidural steroid injection under fluoroscopic guidance.  Tr. 176-177.

On **June 5, 2003**, Gutierrez returned  to see Dr. Burg and requested injections.  Tr. 232. Dr. Burg "injected the L5-S1 facet joint with paravertebral blocks with good relief and improvement in range of motion."  *Id.*  Dr. Burg directed Gutierrez to return in one month and renewed his medications.

On **July 3, 2003**, Gutierrez returned for his follow up with Dr. Burg.  Tr. 231.  Dr. Burg noted:

> Dale is seen today in follow up.  Basically, nothing has changed.  He continues on his multiple opiate medications, including Percocet and OxyContin as well as baclofen for spasticity.  He has had increasing trouble sleeping and took some of his wife's antidepressant, trazondone, at 50 mg q.h.s.  This helped quite a bit with his sleep.  He wanted to know if I would prescribe that for him and I told him that was not a problem, since it is an non-addicting antidepressant, which can markedly induce sleep and actually help with pain as well.

*Id.* (emphasis added).  Dr. Burg noted Gutierrez had "diffuse lumbar spine tenderness throughout" and renewed his medications.  Dr. Burg also prescribed trazodone 50 mg at bedtime.

On **July 23, 2003**, Dr. Hermes noted Gutierrez "did not obtain benefit from the right L5-S1 transforaminal epidural injection performed on 5/16/03."  Tr. 174.  Dr. Hermes also noted "**[t]here is no pain behavior**."  *Id.*  Dr. Hermes recommended an SI injection.

On **July 31, 2003**, Gutierrez returned to see Dr. Burg.  Tr. 230.  Dr. Burg noted that Gutierrez was having "**quite a bit of back pain and would like to go up on his OxyContin**."

*Id.*  **Dr. Burg gave him an extra dose of Percocet a day instead**.  Dr. Burg also renewed all his

medications.

On **August 21, 2003**, Steven Sacks, M.D., a psychiatrist, evaluated Gutierrez at the

agency's request.  Tr. 186-190.  Dr. Sacks noted the purpose of the evaluation as: "Assessment of

possible psychiatric impairment and subsequent restrictions in activity.  I was also asked to

comment on this claimant's efforts and cooperation with the evaluation and how it affects the

validity of the testing/mental status.  Tr. 186.  Dr. Sacks assigned Gutierrez a GAF score[6] of 60

"during the last year and currently."  Tr. 190.   A GAF score of 60 indicates moderate difficulty in

social, occupational, or school functioning.  DSM-IV-TR at 34.  Dr. Sacks also found "**no**

**evidence of somatization or symptom magnification**.  Tr. 189.

Dr. Sacks found in part:

CURRENT LEVEL OF DAILY FUNCTIONING (INDEPENDENT OF SUPERVISION
OR DIRECTION):  The claimant describes his typical day as awakening between 5:30 and
6:30 a.m.  He will take his medications.  He makes sure that his wife gets up to go to her
employment.  He also wakes up his 10-year-old son and 4-year old daughter.  He will drive
his son to school.  He baby-sits his daughter during the day.  He will prepare breakfast for her
but usually does not eat.  He usually showers in the evening.  He will prepare lunch for
himself and his daughter.  During the day, he will feed the chickens, the dogs, and the cats,
also water the grass.  He picks up his son from school about 2:30 p.m.  He prepares dinner
for the family.  In the evening he watches TV and usually retires around 10:00 p.m.

** ** ** ** ** **

CLINICAL IMPRESSION: The claimant could relate with other workers, supervisors, or the
public.  He could deal with changes in the workplace situation and be aware of normal
hazards and react appropriately.  He is able to provide his own transportation.

---

[6] Global Assessment of Functioning (GAF score) is a subjective determination which
represents "the clinician's judgment of the individual's overall level of functioning."   American
Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th
ed. 2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent
danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene,
or serious suicidal act with clear expectation of death.).  DSM-IV-TR at 34.

ABILITY TO CARRY OUT INSTRUCTIONS:  The claimant could understand and remember simple as well as more complex instructions.  He could maintain the attention required to perform simple repetitive and somewhat more complex tasks.  The claimant's ability to withstand stress and pressures associated with most day-to-day work activities seems mainly related to his orthopaedic difficulties.  He is getting a moderately good response to his current antidepressants.  His intermittent insomnia seems mainly related to being awakened by his orthopaedic pain.

PROGNOSIS: The claimant probably would respond to a pain management program.  **I have no records and not aware what Dr. Burg is doing with the claimant other than the analgesics.**  it seems he is getting a reasonable response to his current antidepressants.  He has never been involved with Department of Vocational Rehabilitation and might be considered for consideration.

Tr. 189-190 (emphasis added).

On **August 29, 2003**, Gutierrez returned to see Dr. Burg.  Tr. 229.  The examination showed "**marked lumbar tenderness, particularly over the facet region with positive straight leg raising**."  *Id.*  Dr. Burg renewed all his medications.

On **September 26, 2003**, Dr. Burg reevaluated Gutierrez.  Tr. 227-228.  Dr. Burg noted:

**Narrative**
Mr. Gutierrez is a gentleman with grade 1 L5-S1 spondylolistheses, bilateral pars defect.  He has had previous right-sided L3, L4 and AR medial branch blocks, epidural steroid injections and 3 weeks ago, he underwent what sounds like right-sided SI joint readiofrequency ablation.  He describes 3 separate needle sticks being done for the radiofrequency ablation of the SI.  He felt that the RF helped for perhaps 2 weeks, maximum, but since that time, his pain has returned to an average 8/10 level, at the least 4/10 and at the worst is 10/10.  He describes the pain as beginning in the area of the right SI joint with radiation into the right leg.  This sounds like an L5 distribution.  The pain is described as constant, deep, bruise feeling with some occasional burning.  The pain is 80% in his back and 20% in his leg.  His bowel or bladder functions are intact.  He is doing very little in the way of activity.  He notes that in the past, he has done gardening, but this year, he had to have his mother do the planting for the garden.

\*\* \*\* \*\* \*\* \*\*

**Impression**
Low back pain that radiates in a right L5 distribution with a documented spondylolisthesis and bilateral pars defect at the L5-S1 level.  He has had multiple interventional procedures, none of which have given significant long-term relief.  I think at this point, it is time to refer him to a spine surgeon, at least for evaluation and recommendations.  He is not committed to going through surgery, by having that evaluation and recommendations.  **He is certainly quite nonfunctional with the management that has currently been tried.**  I think that tall of the steps that have been done so far have been perfectly appropriate, but have not brought any

20

> significant improvement for him.  Until he is able to be seen by a surgeon, we will increase
> his OxyContin to 20 mg qid and add Neuronitn 300 mg quid.  We will keep his other
> medications the same.

Tr. 227-228 (emphasis added).

On **October 20, 2003**, Claude D. Gelinas, an orthopedic surgeon, evaluated Gutierrez.
Tr. 219-220.  On that day, Gutierrez was taking OxyContin, Percocet (pain medication),
Neurontin, Zoloft, Wellbutrin, Celebrex, and Aciphex.  Tr. 219.  Dr. Gelinas noted Gutierrez'
range of motion of the back was slightly limited, straight leg raising was negative, sensory
examination was grossly normal, there was no focal motor weakness, and no atrophy or edema.
Tr. 220.  Dr. Gelinas obtained AP, flexion and extension x-rays which indicated a mobile isthmic
spondylolisthesis at L5-S1 with mild degenerative changes.  *Id.*  Dr. Gelinas diagnosed Gutierrez
with idiopathic pars defect L5-S1 and ordered a new MRI scan.  Dr. Gelinas opined Gutierrez had
three options: (1) continue to live with his pain; (2) continue with his pain management program;
or (3) consider a one level fusion operation.  *Id.*

On **October 24, 2003**, Gutierrez returned to see Dr. Burg.  Tr. 225-226.  Dr. Burg noted
Dr. Gelinas had evaluated Gutierrez and recommended surgical intervention for his
spondylolisthesis.  G**utierrez reported his pain remained at 8-9/10 in the lower back**.  Dr.
Burg discontinued the Neurontin and prescribed amitriptyline instead.

On **November 21, 2003,** Gutierrez returned to see Dr. Burg.  Tr. 224.  Gutierrez was still
waiting approval for his back surgery.  Dr. Burg discontinued the amitriptyline due to side effects
and prescribed Ambien instead.

On **December 15, 2003**, Gutierrez returned for a follow up with Dr. Gelinas.  Tr. 215.
Dr. Gelinas noted the "new MRI" indicated  there was "definitely bilateral pars defect."  *Id.*  Dr.

Gelinas opined Gutierrez was a candidate for a one level fusion, discussed the risks involved with surgery, and the alternative.  The radiology report indicated a "bilateral pars defect."  Tr. 216. The MRI indicated a mild facet hypertrophy at L3-4.  Tr. 217.

On **January 16, 2004**, Dr. Burg noted Gutierrez was still awaiting approval for his back surgery.  Tr. 223.  Dr. Burg also noted Gutierrez' "**pain remains about the same, 8/10, beginning in the SI region and radiating in the right L5 distribution**."  *Id.*  Gutierrez reported he was taking Nexium 40 mg every day, OxyContin 20 mg every six hours, Percocet 5 mg four times a day, Ambien 10-20 mg at bedtime, trazodone 50 mg at bedtime, Baclofen 10 mg four times a day, Celebrex 200 mg every day, Zoloft 50 mg every day, Wellbutrin SR 150 mg and Neurontin 300 mg four times a day.  *Id.*  **Dr. Burg diagnosed Gutierrez with low back pain with right L5 radiculopathy, secondary to spondylolisthesis.  Dr. Burg continued all medications and made no changes**.

On **June 14, 2005**, Dr. Gelinas performed a "lumbar laminectomy, diskectomy, and fusion L5-S1."  Tr. 287.  Dr. Gelinas noted:

> This 49-year-old male complains of unbearable low back and leg pain.  Studies have demonstrated spondylolisthesis.  He was admitted for surgery.  On 06/14/2005 he was taken to the operating room and lumbar laminectomy, diskectomy, and fusion at L5-S1 with inner body cages pedicle screws was accomplished.  He tolerated this without difficulties.  Postoperatively his course was unremarkable.  With the aid of Physical Therapy he was mobilized.  He was promptly up ambulating, eating, and voiding without difficulties.  On his third postoperative day he was then discharged home.

*Id.*  Dr. Gelinas prescribed Oxycodone with APAP 5/325 mg.